IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA
ALEXANDRIA DIVISION

FILED
IN OPEN COURT

FEB -3 21

CLERK, U.S. DISTRICT COURT
ALEXANDRIA, VIRGINIA

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>ROBERT S. STEWART, JR.,<br><br>*Defendant*. | Case No. 1:21-CR-5 (RDA) |

### STATEMENT OF FACTS

The United States and the defendant, ROBERT S. STEWART, JR., (hereinafter "STEWART" or "the defendant") stipulate that the allegations in the three-count Criminal Information and the following facts and statements are true and correct. The United States and the defendant further stipulate that had this matter gone to trial, the United States would have proven the allegations in the Criminal Information and the following facts beyond a reasonable doubt using admissible and credible evidence.

1. At all times relevant to this Criminal Information:

    A. ROBERT S. STEWART, JR. was a resident of Arlington, Virginia and the Chief Executive Officer and sole owner of Federal Government Experts, LLC. Federal Government Experts, LLC sought and obtained contracts to supply departments and agencies of the United States Government with goods and services, including contracts to provide personal protective equipment to combat the COVID-19 pandemic. Federal Government Experts, LLC (hereinafter "FGE") maintained its principal place of business in Falls Church, Virginia, within the Eastern District of Virginia.

    B. The Department of Veteran's Affairs (hereinafter "the VA") was a

department of the United States Government responsible for providing services and benefits to American military veterans and their families. VA benefits included payments for medical expenses and educational services. Within the VA, the Veterans Health Administration operated 1,255 health care facilities and provided health care services to approximately 9 million enrolled Veterans each year.

C. The Federal Emergency Management Agency (hereinafter "FEMA"), was a federal agency within the United States Department of Homeland Security. FEMA was responsible for the preparation, coordination, and relief efforts relating to disasters.

D. The Small Business Administration (hereinafter "the SBA"), was an agency within the United States Government that provided assistance, including financial assistance, to small businesses. The SBA's computer servers which, among other things, receive information about loan applications, are located in the Eastern District of Virginia.

E. Celtic Bank provided a range of traditional banking services throughout the United States, including in the Eastern District of Virginia, and is a financial institution as defined by Title 18, United States Code, Section 20. Celtic Bank is a participating lender in the federal Paycheck Protection Program.

**I.     Count 1: False Statements to the VA and FEMA**

2. In response to the COVID-19 pandemic, several departments and agencies of the United States Government, including the VA and FEMA, sought to acquire personal protective equipment (hereinafter "PPE"), including N95 respirator masks approved by the National Institute for Occupational Safety and Health (NIOSH). The acquisition of N95 masks was in furtherance of the duties and responsibilities of the VA and FEMA, and as such their acquisition was a matter within the jurisdiction of the executive branch of the United States Government. As set forth

below, STEWART knowingly and willfully made materially false, fictitious, and fraudulent statements to officials of the VA and FEMA regarding the acquisition of N95 masks, in violation of Title 18, United States Code, Section 1001(a)(2).

### *False Statements to the VA*

3. On or about April 4, 2020, STEWART sought to sell PPE to the VA. In attempting to secure a contract with the VA, STEWART sent an email to a VA procurement official which stated that FGE had "[p]ersonal [p]rotection [e]quipment on hand and ready to support the COVID-19 Pandemic." At the time of this email, STEWART then and there knew that the statement was false because FGE did not have actual or constructive possession of PPE and therefore did not have PPE "on hand."

4. Based in material part on STEWART's false representation that he had PPP "on hand," on or about April 10, 2020, the VA awarded STEWART and FGE a contract to supply six million N95 masks at a cost of 35 million dollars to be used by VHA. The contract called for the masks to be delivered to a VA warehouse in Illinois on or before April 22, 2020, at which time FGE would be paid.

5. On or about April 16, 2020, STEWART stated in an email to a VA official that, "I have 20M N95 mask(s) at LAX that is being reviewed by a third party right now." At the time of this email, STEWART then and there knew that the statement was false because he knew that neither he nor FGE had any N95 masks at the Los Angeles International Airport.

6. On April 22, 2020, STEWART failed to deliver any masks to the VA as required by the contract. Based on additional false representations by STEWART regarding his possession of N95 masks and his ability to comply with the contract, VA officials extended the delivery date to April 25, 2020.

7. On or about April 24, 2020, STEWART sent by email photographs to VA officials purporting to be the actual N95 masks that were going to be delivered to the VA. At the time of this email, STEWART then and there knew that the statement was false and the photographs were fraudulent because there were no N95 masks in his possession and ready to be delivered to the VA.

8. On April 25, 2020, STEWART again failed to deliver any masks to the VA as required by the contract. In an effort to extend the delivery date again, on about April 26, 2020 and April 29, 2020, STEWART sent emails to VA officials stating that he had "secured" 9 million N95 masks for the VHA. At the time of these emails, STEWART then and there knew that the statements were false because he had not secured any N95 masks for the VHA.

9. On April 29, 2020, the VA terminated the contract with STEWART and FGE due to their failure to deliver and STEWART's repeated false statements.

10. The false statements set forth herein were made by STEWART from the FGE office in Falls Church, Virginia, within the Eastern District of Virginia, and elsewhere.

*False Statements to FEMA*

11. Beginning on or about April 1, 2020, STEWART sought to sell PPE to FEMA. In attempting to secure a contract with FEMA, STEWART made the following materially false statements:

A. On or about April 1, 2020, STEWART submitted a Vendor Vetting Questionnaire to FEMA in which he stated that he had PPE, including N95 masks, "stored securely in our climate control warehouse located in VA and PA." STEWART also stated in the questionnaire that the "products are located (about 30%) in our warehouses located VA/PA (see photos above)." At the time STEWART submitted this questionnaire to FEMA, STEWART then

and there knew that these statements were false and the photographs were fraudulent because FGE did not have actual or constructive possession of PPE, including N95 masks, and therefore did not have PPE located in any warehouses in Virginia, Pennsylvania or in any other location.

    B. On or about April 5, 2020, STEWART spoke with a FEMA procurement official and told the official that STEWART had 2 million N95 masks in a warehouse and he could sell 250,000 of those masks to FEMA. At the time STEWART made this statement, STEWART then and there knew that this statement was false because FGE did not have actual or constructive possession of any N95 masks.

    C. On or about April 13, 2020, STEWART provided two photographs of N95 masks that STEWART represented he had "on hand." At the time STEWART made this representation, STEWART then and there knew that this statement was false and the photographs fraudulent because FGE did not have actual or constructive possession of any N95 masks.

    12. Based in material part on STEWART's false representations set forth above, on or about April 15, 2020, FEMA awarded STEWART and FGE a contract to supply 500,000 N95 masks at a total cost of $3,510,000. The contract called for the masks to be delivered to a FEMA warehouse located in Sharon Hill, Pennsylvania on or before May 4, 2020, at which time FGE would be paid.

    13. Knowing that he was not going to be able to deliver 500,000 N95 masks to the FEMA warehouse in Sharon Hill, Pennsylvania by May 4, 2020, STEWART requested an extension of the delivery date to May 11, 2020. In support of his request for an extension, on or about May 1, 2020, STEWART stated to a FEMA procurement official that STEWART's "team secured and has 500,000 N-95 masks en route to Sharon Hill, PA currently." At the time STEWART made this representation, STEWART then and there knew that this statement was

false because FGE did not have actual or constructive possession of any N95 masks. Nevertheless, FEMA officials relied on STEWART's false statement and extended the delivery date to May 11, 2020.

14. Knowing that STEWART was not going to be able to deliver 500,000 N95 masks to the FEMA warehouse in Sharon Hill, Pennsylvania by May 11, 2020, STEWART requested a second extension of the delivery date to May 14, 2020. In support of his request for a second extension, on or about May 11, 2020, STEWART stated to a FEMA procurement official that at that moment STEWART had employees outside an N95 manufacturer's warehouse in Tennessee waiting for the manufacturer to release the masks for shipping. At the time STEWART made this representation, STEWART then and there knew that this statement was false because FGE did not have any employees waiting outside a manufacturer's warehouse in Tennessee and FGE was not waiting for a delivery of N95 masks. Nevertheless, FEMA officials relied on STEWART's false statement and extended the delivery date to May 14, 2020.

15. STEWART failed to deliver any masks to FEMA as required by the contract, and thereafter FEMA terminated the contract.

16. The false statements set forth herein were made by STEWART from the FGE office in Falls Church, Virginia, within the Eastern District of Virginia, and elsewhere.

**II.     Count 2: Wire Fraud (Victims Celtic Bank and the Small Business Administration)**

17. From on or about March 30, 2020 to in or about July 2020, in the Eastern District of Virginia and elsewhere, STEWART knowingly devised and intended to devise a scheme and artifice to defraud Celtic Bank and the SBA, and to obtain money and property from Celtic Bank and the SBA by means of materially false and fraudulent pretenses, representations, and promises. STEWART executed this scheme to defraud by making materially false representations on a

Paycheck Protection Program loan application submitted to Celtic Bank, and on an Economic Injury Disaster Loan application submitted to the SBA. Also in furtherance of the defendant's scheme to defraud, once the loans were approved and the funds were disbursed, STEWART used the loan proceeds for prohibited purposes, including personal expenses.

### *The Paycheck Protection Program*

18. The Coronavirus Aid, Relief, and Economic Security ("CARES") Act is a federal law enacted in or around March 2020 and designed to provide emergency financial assistance to the millions of people who are suffering the economic effects caused by the COVID-19 pandemic. One source of relief provided by the CARES Act was the authorization of up to $349 billion in forgivable loans to small businesses for job retention and certain other expenses, through a program referred to as the Paycheck Protection Program ("PPP"). In or around April 2020, Congress authorized over 300 billion in additional PPP funding.

19. In order to obtain a PPP loan, a qualifying business was required to submit a PPP loan application signed by an authorized representative of the business. The PPP loan application required the business (through its authorized representative) to acknowledge the program rules and make certain affirmative certifications in order to be eligible to obtain the PPP loan. In the PPP loan application, the small business (through its authorized representative) was required to state, among other things, its: (a) average monthly payroll expenses; and (b) number of employees. This information was used to determine whether the applicant was eligible for a PPP loan and, if so, to calculate the amount of money the small business was eligible to receive. In addition, businesses applying for a PPP loan were required to provide documentation showing their payroll expenses.

20. A PPP loan application was required to be processed by a participating financial institution (the lender). If a PPP loan application was approved, the participating financial

institution funded the PPP loan using its own monies, which were 100% guaranteed by the SBA. Data from the application, including information about the borrower, the total amount of the loan, and the listed number of employees, was transmitted by the lender to the SBA in the course of processing the loan.

21. PPP loan proceeds were required to be used by the business for certain permissible expenses – payroll costs, interest on mortgages, rent, and utilities. The PPP allowed the interest and principal on the PPP loan to be entirely forgiven if the business spent the loan proceeds on these expense items within a designated period of time (usually eight weeks of receiving the proceeds) and used a certain percentage of the PPP loan proceeds on payroll expenses.

### *The Economic Injury Disaster Loan Program*

22. The Economic Injury Disaster Loan ("EIDL") program was an SBA program that provided low-interest financing to small businesses, renters, and homeowners in regions affected by declared disasters.

23. The CARES Act also authorized the SBA to provide EIDL loans of up to $2 million to eligible small businesses experiencing substantial financial disruption due to the COVID-19 pandemic. In addition, the CARES Act authorized the SBA to issue advances of up to $10,000 to small businesses within three days of applying for an EIDL loan. The amount of the advance was determined by the number of employees the applicant certified having. The advances did not have to be repaid. An advance could be made before a loan was accepted or declined.

24. In order to obtain an EIDL and advance, a qualifying business was required to submit an application to the SBA and provide information about its operations, such as the number of employees, gross revenues for the 12-month period preceding the disaster, and cost of goods sold in the 12-month period preceding the disaster. In the case of EIDL loans for COVID-19 relief,

the 12-month period was that preceding January 31, 2020. The applicant was also required to certify that all of the information in the application was true and correct to the best of the applicant's knowledge.

25. EIDL applications were submitted directly to the SBA and processed by the agency with support from a government contractor, Rapid Finance. The amount of the loan, if the application was approved, was determined based, in material part, on the information provided in the application about employment, revenue, and cost of goods, as described above. Any funds issued under an EIDL or advance were issued directly by the SBA. EIDL funds could be used for payroll expenses, sick leave, production costs, and business obligations, such as debts, rent, and mortgage payments. If the applicant also obtained a loan under the PPP, the EIDL funds could not be used for the same purpose as the PPP funds.

***The Celtic Bank PPP Loan***

26. On or about May 2, 2020, STEWART, acting as the owner and authorized representative of FGE, applied for a PPP loan at Celtic Bank.

27. In the loan application, digitally signed by the defendant, STEWART knowingly falsely and fraudulently stated the following:

    A. That FGE had 37 employees, when, in fact, FGE had 9 employees.

    B. That FGE had and average monthly payroll of $322,000, when, in fact, FGE had an average monthly payroll of $13,907.

28. As an attachment to his loan application, STEWART submitted a false and fraudulent IRS Form 941 (Employer's Quarterly Federal tax Return) to Celtic Bank. The IRS 941 Form was fraudulent in that it falsely stated that during the first quarter of 2020, FGE paid 37 employees a total of $960,000 in wages. STEWART represented that the IRS 941 Form was filed

with the IRS when, in fact, it never was. STEWART intended for Celtic Bank to rely on the fraudulent IRS 941 Form to corroborate STEWART's false claims in the PPP loan application regarding the number of FGE employees and FGE's average monthly payroll.

29. Celtic Bank approved FGE's PPP loan application and disbursed $805,000 to FGE. In so doing, Celtic Bank relied on the materially false statements made by STEWAERT in the loan application and the IRS Form 941.

30. On or about July 23, 2020, STEWART repaid Celtic Bank $791,507.95.

### *The SBA EIDL Loan*

31. On or about March 30, 2020, STEWART, acting as the owner and authorized representative of FGE, applied for an EIDL loan with the SBA.

32. In the loan application, digitally submitted by the defendant, STEWART knowingly falsely and fraudulently misrepresented information about FGE's operations, including the number of employees and the company's payroll information.

33. The SBA relied on the materially false statements made by STEWART in the loan application in determining FGE's eligibility for an EIDL loan, eligibility for an advance of an EIDL loan, and the amount of the loan and advance to be paid to FGE by the SBA.

34. On or about April 14, 2020, the SBA disbursed a $10,000 advance on the EIDL loan to FGE. On or about April 19, 2020, the SBA approved FGE's EIDL loan application, and on or about April 20, 2020, the SBA disbursed an additional $251,500 to FGE. The total amount disbursed by the SBA to FGE based on STEWART's false and fraudulent misrepresentations was $261,500.

35. STEWART used the EIDL loan proceeds for prohibited purposes, including personal expenses.

36.     On or about March 30, 2020, for the purpose of executing the above-described scheme and artifice to defraud, and for the purpose of obtaining money and property by means of materially false and fraudulent pretenses, representations, and promises, STEWART knowingly transmitted and caused to be transmitted by means of wire communication in interstate commerce a writing, sign, signal, picture and sound, namely the digital submission of the application by STEWART and FGE for an EIDL loan from the SBA, that originated in the Eastern District of Virginia and was transmitted in interstate commerce, including to the SBA computer server, also located in the Eastern District of Virginia, in violation of Title 18, United States Code, Section 1343.

### III.    Count 3: Theft of Government Funds (The VA Benefits Fraud)

37.     From in or about September 2013 to on or about October 30, 2020, in the Eastern District of Virginia and elsewhere, STEWART knowingly and willfully embezzled, stole, purloined, and converted to his own use a record, voucher, money, or thing of value of the United States or any department or agency thereof, namely $73,722.45 in funds from the VA, in violation of Title 18, United States Code, Section 641.

38.     From in or about September 2013 to on or about November 16, 2013, STEWART submitted documents to the VA in support of a claim for medical benefits.  STEWART's application to the VA to receive medical benefits was completed and received by the VA on or about November 16, 2013. In support of STEWART's application, he submitted to the VA a DD Form 214 (Certificate of Release or Discharge from Active Duty), which stated that STEWART served in the United States Marine Corp from August 24, 2004 to August 23, 2008. The DD Form 214 submitted to the VA by STEWART also stated that STEWART obtained the rank of Corporal and earned the Rifle Expert Badge, Pistol Expert Badge, Meritorious Mast, National Defense

Service Medal, Sea Service Deployment Ribbon, Southwest Asia Service Medal, Certificate of Appreciation, and the Kuwaiti Liberation Medal. The DD Form 214 was material to the VA's decision to approve STEWART's claim for benefits.

39. The DD Form 214 submitted by STEWART to the VA was false and fraudulent in every respect. STEWART never served in the United States Marine Corp. STEWART never obtained the rank of Corporal and never earned any medals or commendations from the Marine Corp.

40. STEWART also submitted false and fraudulent medical documentation in support of his claim for medical benefits.

41. Based entirely on the materially false statements made by STEWART to the VA and false documents submitted by STEWART to the VA, the VA approved medical and educational benefits be paid to STEWART. Beginning on or about October 6, 2014 and continuing through on or about October 30, 2020, in the Eastern District of Virginia, STEWART received a total of $73,722.45 in VA medical and educational benefits as a result of the false and fraudulent claim STEWART submitted to the VA on November 16, 2013.

### Conclusion

42. STEWART's actions in furtherance of the three charged offenses, including but not limited to the acts described above, occurred in the Eastern District of Virginia and were done willfully, knowingly, with the specific intent to violate the law, and not because of accident, mistake, or other innocent reason.

43. The foregoing Statement of Facts is a summary of the principal facts that constitute the legal elements of the charges set forth in the three count Criminal Information. This summary does not describe all the evidence that the United States would present at trial or all of the relevant

conduct that would be used to determine STEWART's sentence under the Sentencing Guidelines and pursuant to Title 18, United States Code, Section 3553 after a trial.

Respectfully submitted,

Raj Parekh
Acting United States Attorney

By: *William Fitzpatrick*
William Fitzpatrick
Assistant United States Attorney

Date: January 17, 2021

Defendant's Stipulation and Signature: After consulting with my attorney and reviewing the above Statement of Facts, I hereby stipulate that the above Statement of Facts is true and accurate. I further stipulate that had this matter proceeded to trial, the United States would have proven the same, as well as the allegations in the three-count Criminal Information, beyond a reasonable doubt.

Date: 2/3/2021

Robert S. Stewart, Jr.
Defendant

Defense Counsel's Signature: I am the defendant, Robert S. Stewart's, attorney. I have carefully reviewed the above Statement of Facts with him. To my knowledge, his decision to stipulate to these facts is informed and voluntary.

Date: 2-3-21

Robert L. Jenkins, Jr.
Counsel for the Defendant